On the Merits.
Counsel for plaintiff have furnished the ■court with the report of a case decided by the Supreme Court of South Carolina, wherein the law applicable to the issues herein presented is so clearly and satisfactorily stated that, with an acknowledgment of •our indebtedness, we venture to appropriate the statement as follows, to wit:
“In 1 Thomp. on Neg. § 28, the author says: ‘-In determining whether the due degree of care has been exercised in any situation, reference must be made to the facts and surroundings of that situation, and the question cannot be determined by abstract theorizing or idealizing. The question must be looked at as the defendant might have looked at it, situated as he was, and surrounded as he was. The jury ought to determine by their foresight, and not by their hindsight. Speaking with reference to this question, it has been quaintly reasoned that the fact that, after an injury occurs by accident, some man of genius discovers a superior method of preventing such accidents, does not show negligence in failing to use such method of prevention. Accordingly, that which never happened before, and which, in its character, is such that it would not naturally occur to prudent men to guard against its happening, cannot, when in the course of years it does happen, furnish good grounds for a charge of negligence in not foreseeing its possible happening and guarding against that remote contingency.’
“In Cornman v. Eastern Counties R. Co., 4 H. & N. 786, Bramwell, B., said: ‘In such case, it is always a question whether the mischief could have been reasonably foreseen. Nothing is so easy as to be wise after the event.’
“In 21 A. & E. Ene. L. (2d Ed.), p. 489, it is said: ‘The mere fact that an injury might have been avoided by the adoption of certain precautions does not prove that there was fault in failing to anticipate and provide against it. Nor is the_ fact that, after the occurrence of an accident, it is seen that such accident might easily have been guarded against, conclusive of negligence. Thus, where the possibility of a particular occurrence is demonstrated only by its happening, there is no liability in negligence. But the fact that no such accident as the one complained of had ever happened before is not, of course, conclusive of the fact that there was no negligence.’_ In volume 13 of the same work, page 721, it is said: ‘An extraordinary flood is to be classed among the acts of God, which no human power can prevent or avert. Whether it wiE relieve the carrier from liability depends upon whether its results or natural consequences could, by the exercise of reasonable foresight and prudence, have been foreseen and guarded against. If the emergency was one that no human sagacity, guided by any one of the known principles of human reasoning, could have anticipated, the carrier will be relieved. If, on the other hand, its effects might have been foreseen by the exercise of reasonable düigence and prudence, a failure to do so would be negligence, and subject the carrier to damages, although the original cause was the act of God.’ And on page 722 of the same volume this rule is stated: ‘If the carrier discovers that goods intrusted to his care are in peril of injury or destruction by flood, then it becomes his duty to use, actively and energetically, all the means at his command, or which it might be expected that one engaged in such a business would possess, to meet the emergency and save the property from injury, and any neglect to use the means stated above, which prudent, *630 sk-illful men in that business might ordinarily be expected to use in such an emergency, will subject the carrier to liability.’
“It requires no citation of authority to sustain the proposition that after a carrier has discovered, or by the exercise of reasonable prudence and diligence should have discovered, that goods in his possession are subject to the perils of an unprecedented flood, or other vis major, it is his duty to exercise reasonable care and diligence to save them from damage or loss.”
W. E. Ferguson v. Southern Ry. Co., 91 S. C. 61, 74 S. E. 129.
Applying the principles of law thus stated to the facts of the case before it, the learned court found that, after the defendant (being the same defendant as in this case) was in a position to know that the flood (being the same flood that we are here considering) had broken all previous high water records, it was still in a position, by the exercise of ordinary diligence and the use of the means at its command, to have saved the plaintiff’s goods, and that, having failed to do so, it was liable for their value. We do not,' however, find that a similar condition existed in the case here presented. The negligence attributed to defendants is “articulately propounded” in the brief of plaintiff’s counsel, and the different charges may be considered in the order thus stated:
1. “They allowed the two cars, one shipped August 21st, and the other August 22d, 24 hours apart, to be in the same train in the Hamburg yard on the night of August 25th, without giving any reason for delay of first car.”
The petition imputes no negligence on the account thus stated, and the record is barren ■of evidence tending to show that there was .any unusual delay in the forwarding of either of the cars.
2. They brought the cars from a safe place in Augusta, and placed them in the lowest part of the yard, though the river, which had flooded all the ears in the yard in 1888, had been rising at' the rate of from 5 to 8 inches per hour for 36 hours, and the weather report of August 25th showed rainfall of 5.63 inches at Anderson, 102 miles above Augusta, and 3.65 inches at Calhoun Falls, just below Anderson.
About the only evidence as to the safety of Augusta, that we find in the record, is that which tells of the water running through the streets like a mill race, the destruction of life and property, the wiping out of a riverside railroad yard, and the washing down the river of some freight cars.
On the other hand, according to the oral testimony adduced, and a blueprint which purports to show certain features of the Hamburg yard, including the position of the cars that were destroyed, 33 feet of water “would not do any damage to tracks or cars in Hamburg yard,” and, up to 10:30 o’clock on the morning of August 26th, 33 feet was all that was predicted by the Weather Bureau, with the information above referred to, as to the rainfall, in its possession. The blueprint shows that though the water attained a height of 38.8 feet, it rose only 9 inches above the floors of the rice cars, so that, between the stage that was predicted and that which was attained, there was a margin of 5.8 feet, in order to consume which it was necessary that the water should rise higher than it had ever done before, and, in order that it should do so before the ears could be moved, it was necessary that it should eowe down, as it did come, in such volume as was never before known. In other words, it was not only the high stage eventually reached, but also the unexpected rapidity with which it was reached, that was unprecedented. And if the Weather Bureau, with its facilities for collecting information and its trained experts, who devote themselves to that work, were unable to foresee any danger greater than would result from a 33-foot stage of water, we know of no basis upon which the defendant can be 'held to have been negligent in not having done so, any more than could the citizens of Augusta, who lost their property and their lives, be so held.
*632 3. The Weather Bureau having issued its warning of 33-foot water on the morning of the 25th, defendant was negligent in not foreseeing that its tracks and trestles would probably be undermined—
“on account of the great quantity of lumber in the yards in North Augusta, which lumber was bound to dam up against the trestles and weaken them, if the water ever reached these lumber mills.”
The name “North Augusta” does not appear in the transcript, so far as we remember, nor is there anything there about lumber mills. There is testimony to the effect that “logs of wood and timber” and “driftwood” were brought down by the current and piled up'against the trestles; but there is also testimony showing that all the bridges above the mouth of Rocky river, as also 250 acres of an island below that point, were washed away, which could hardly have been anticipated from the Bureau warning of August 25th, but which may account for the logs, wood, and timber against the trestles.
4. They were negligent in putting the car of lime in the train with the rice cars, since it was bound to ignite if the flood proved to be as great as in 1888.
The flood in 1888 was only an'inch or so lower than that of 1908; but, according to the uncontradicted testimony, the people interested received more timely warning of its rise and approach, and the'warning of a 33-foot stage of water, from an official and authoritative source, was not a warning against such a flood. There is no attempt to show that it is unusual or bad railroading to put cars of lime in trains with other merchandise.
5. They were negligent in not attempting to move the rice ears until 7:30 a. m., or later, on the morning of the 26th.
The telegraph operator had gone on duty at 11 o’clock on the night of the 25th, and found the yard “entirely free from water,” and when the yardmaster left the yard, an hour later, “the river was not out of its banks, and no indication of any serious rise, more than there had been several rises previous to that date.” The Weather Bureau did not issue its supplemental warning until 10:30 a. m. of the 26th; but, in the meanwhile, on the return of the yardmaster at 7 o’clock, the steps were taken which are described by the witness Thompson. Just how high the water was at that time does not appear, but it could hardly have suggested any record-breaking stage, as it only reached 34.4 feet some Sy2 hours later, and the impression that we get is that the greater volume of water came down after 7 o’clock, since it is shown to have been rising at the rate of 0.7 feet an hour, at half past 10, and Sykes, who seems to have experienced no difficulty in getting to the office at 7, says that at 11, when he returned home, he was obliged to wade “almost neck deep.” Looking backward, it is easy to see, and to say, that many things might have been done on the day and night of the 25th; hut, considering the situation as it then appeared, to those who were best informed (the officers of the Weather Bureau), the necessity for doing anything, except what was done, did not suggest itself. It did not suggest itself to the defendant, for the protection of its own property, or to the people of Augusta, for the protection of their property or their homes, and we cannot say that defendant was negligent in failing to realize the existence of such necessity for the benefit of the plaintiff.
6.It is said that defendants were guilty of negligence, in that the Bureau report of the 26th showed-34.4 feet of water, with a prospect of 38 feet; that, the distance from the rail to the floor of a box ear being only 34 inches^ they should have known that the lime was only 10 inches from the water, and would be in contact with it within 90 min *634 utes, and yet they made no arrangements to extinguish the inevitable fire.
• As we understand the testimony, the water reached the floor of the car when it reached the stage of 37.9 feet (or 0.9 feet below the maximum), but just when that was the evidence does not show. There are two or three witnesses who testify that it was impossible to get to the burning cars without a “batteau,” that they had none, and that they availed themselves of the “very first one” that they were able to get. They were there, on the spot; they testify to a matter within their knowledge; there is no effort to impeach them; and not a syllable in the way of contradiction, or as showing that some one else might have done what they say they were unable to do. We must therefore accept their testimony as true.
7. “They were guilty of the grossest and most unpardonable negligence, because they waited 17 hours for some passer-by to get a boat. * * * During this 17-hour wait the passenger trains on the main line- were running, and there were boats, presumably, in both places, as one witness testifies that he rowed all over the yards in September, 1888.”
The only .testimony in the record upon the subject of the boat is that to which we have referred, and that to which the counsel refer. There is nothing about the running of the passenger trains, or about places where boats are “presumably” to be found; nor does it follow, as we think, that, because a witness had rowed around in a boat in 1888, he found the boat in less than 17 hours, or that he could have found one in 1908 in less time. In a suddenly inundated city, as when ships sink at sea, those who have boats are likely to need them for their own purposes.
8. “They are guilty of negligence because these floo.ds were caused by rains higher up the Savannah river (i. e., about 102 miles) than those that caused the flood of 1888. As they had greater time to make preparations, they should have known that this car of unslacked lime endangered the whole situation,” etc.
The only testimony upon the point thus suggested is to the effect that the people about Augusta and Hamburg had less notice of the flood of 1908 than of that of 1888, and that testimony, considered in connection with the reasons given, is conclusive of the fact.
[1] It being established, beyond controversy, that the proximate cause of the loss complained of was an unprecedented flood, which, standing alone, is a sufficient defense to this action, we are of opinion that the burden of proof rested upon the plaintiff to show that, • the flood notwithstanding, the loss could have been averted by the exercise by defendants of reasonable care and skill. Memphis v. Reeves, 77 U. S. (10 Wall.) 176, 19 L. Ed. 909; Elam v. St. Louis, etc., R. R., 117 Mo. App. 453, 93 S. W. 851; I. & G. N. R. R. v. Bergman (Tex. Civ. App.) 64 S. W. 999. Plaintiff has, however, not attempted to carry that burden, save by the cross-examination of defendants’ witnesses, and for the reasons assigned we do not think the attempt, as thus made, successful.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed, and that there now be judgment in favor of defendants, rejecting plaintiff’s demand, and dismissing this suit, at its cost.
For written reasons to be handed down, his honor, the Chief Justice, dissents.